UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS KNOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:14-cv-12457-LTS |
| MASSACHUSETTS DEPARTMENT | ) | |
| OF CORRECTION, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT
[Docket Nos. 118, 122, 125]

July 20, 2017

Boal, M.J.

Plaintiff Thomas Knox, a disabled inmate, asserts nine claims against the following

defendants: the Massachusetts Department of Correction (the "DOC"), Carol Higgins O'Brien

("Higgins O'Brien"), Steven J. O'Brien ("O'Brien"), Michael Corsini, Abbe Nelligan and Tiana

Bennett (collectively, the "DOC Defendants"); Forensic Health Services/MHM, Inc. ("FHS")

and Kimberly Julius (collectively, the "FHS Defendants").  All Defendants have moved for

summary judgment on all counts.  Docket Nos. 118, 122.  Knox has filed a motion for partial

summary judgment.  Docket No. 125.  For the following reasons, the Court recommends that the

District Judge assigned to this case[1] (1) grant the DOC Defendants' motion, (2) grant the FHS

Defendants' motion and (3) deny Knox's partial motion.

---

[1] On February 4, 2016, the District Court referred the case to the undersigned for full pretrial
proceedings.  Docket No. 101.

1

I.      PROCEDURAL BACKGROUND

On April 13, 2015, Knox filed an amended complaint seeking monetary damages and injunctive relief largely as a result of his placement on the second floor of the Massachusetts Treatment Center ("MTC"), a facility of the DOC.  Docket No. 53.  The DOC Defendants and the FHS Defendants filed separate motions to dismiss.  Docket Nos. 62, 63.  On February 3, 2016, the District Judge denied the motions to dismiss in all respects without prejudice to renewal on summary judgment with the following exceptions.  Docket No. 100.  First, he dismissed all claims against the individual DOC Defendants in their official capacities for monetary damages.  Id.  Second, he dismissed DOC as a named defendant for purposes of claims under 42 U.S.C. § 1983.  Id.  Finally, he dismissed Count 5 (cruel and unusual punishment under the Eighth Amendment) insofar as it alleged interference with a rehabilitative need.  Id.

The FHS and DOC Defendants filed motions for summary judgment on February 24 and February 27, 2017, respectively.  Docket Nos. 118, 122.  On February 27, 2017, Knox filed a motion for partial summary judgment against Defendants DOC and FHS on Counts 1-4 only. Docket No. 125.  The DOC Defendants filed an opposition to Knox's motion on March 24, 2017. Docket No. 130.  On March 27, 2017, FHS filed an opposition to Knox's motion, Docket No. 132, and Knox filed oppositions to both motions for summary judgment.  Docket Nos. 134, 137. The parties filed replies on April 7, 2017 (Docket No. 140), April 10, 2017 (Docket Nos. 142, 143) and April 13, 2017 (Docket No. 144).  The Court heard oral argument on June 7, 2017. Shortly thereafter, the parties filed supplemental briefs.  Docket Nos. 153-57.

II.    FACTS[2]

A.    The Parties

Knox, who was an inmate from 2003 to 2016,[3] is a wheelchair bound paraplegic.[4]  The

DOC is a Department of the Commonwealth of Massachusetts.[5]  Carol Higgins O'Brien served

as the Commissioner of the DOC from September 2014 to April 2016.[6]  Michael Corsini was

---

[2] Because this case is before the Court on cross-motions for summary judgment, the Court sets out any disputed facts in the light most favorable to the non-moving party.  See Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  The facts are taken from the parties' Joint Statement of Material Facts and Responses (Docket No. 139), which incorporates all parties' statements of material facts and responses into a single document and includes: Defendant Kim Julius and FHS's Concise Statement of Material Facts ("FHS SOMF"); Statement of Facts Submitted in Support of Department of Correction Defendants' Motion for Summary Judgment ("DOC SOMF") and Plaintiff's Statement of Material Undisputed Facts ("Knox SOMF").

[3] At oral argument, given that Knox was released from custody on November 16, 2016, DOC SOMF ¶ 2, Knox's counsel stated that he was no longer seeking injunctive relief on behalf of himself but continued to seek such relief on behalf of individuals still at the MTC.  Knox's amended complaint does request that the Court order that the MTC be brought into full compliance with the ADA.  Amended Compl. Prayer for Relief ¶ 3; see also Docket No. 156 at 4 ("[t]he Court should order that the DOC make housing determinations for qualified individuals with disabilities based not only on treatment recommendations but also on the individuals' unique accessibility challenges.").  However, "[t]his court is restricted to deciding 'actual controversies by a judgment which can be carried into effect, and [is] not [permitted] to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it[.]'"  Soto v. City of Cambridge, 193 F. Supp. 3d 61, 69 (D. Mass. 2016) (quoting Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri, 361 U.S. 363, 367 (1960)).  Moreover, the PLRA specifically provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).  Cases cited by Knox to the contrary are readily distinguishable.  For example, in Brown v. Plata, 563 U.S. 493 (2011), injunctive relief was found to be appropriate as a result of class action allegations affecting a substantial number of prisoners.  Here, any claim for injunctive relieve for Knox himself is moot as he is no longer in DOC custody.  He lacks standing to seek relief on behalf of other inmates, his papers contain no evidence of other similarly situated inmates, and in any event, his request for relief is not sufficiently tailored to comply with the PLRA.

[4] FHS SOMF ¶¶ 1, 10; Pl. Resp. ¶¶ 1, 10.  DOC SOMF ¶ 3; Pl. Resp. ¶ 3.

[5] DOC SOMF ¶ 1; Pl. Resp. ¶ 1.

[6] FHS SOMF ¶ 4; Pl. Resp. ¶ 4.

employed by the DOC as the MTC's Superintendent from 2010 to June 2014.[7]  Steven O'Brien

began his employment with the DOC in June 2014 and serves as the current Superintendent of

the MTC.[8]  Abbe Nelligan was employed by the DOC as the MTC's Deputy Superintendent of

Classification and Treatment from July 2013 to March 2015.[9]  Tiana Bennett is the DOC's

Director of Classification and Treatment at the MTC.[10]

DOC contracts with FHS to provide the Sex Offender Treatment Program ("SOTP").[11]

Kim Julius (née Lyman),[12] is FHS's Program Director of the SOTP.[13]

B. The Massachusetts Treatment Center: Structure

Beginning in August 2013, Knox was incarcerated at the MTC, a facility that DOC has

designated as handicap-accessible.[14]  The MTC comprises two separate facilities, the main

building and the modular building where Knox was housed.[15]  There is an elevator between the

first and second floors of both the modular building and the main building.[16] Every unit also has

a "stair chair," a fold-up device with wheels that can be used to carry an inmate between floors in

an emergency or a fire drill.[17]  The chow hall is located on the first floor of the main building,

---

[7] FHS SOMF ¶ 6; Pl. Resp. ¶ 6.  DOC SOMF ¶ 8; Pl. Resp. ¶ 8.

[8] DOC SOMF ¶ 5; Pl. Resp. ¶ 5.

[9] FHS SOMF ¶ 7; Pl. Resp. ¶ 7.

[10] FHS SOMF ¶ 9; Pl. Resp. ¶ 9.

[11] FHS SOMF ¶ 3; Pl. Resp. ¶ 3.

[12] Defendant Julius is also referred to as Lyman in the parties' pleadings.  The Court refers to her as Julius herein.

[13] FHS SOMF ¶ 2; Pl. Resp. ¶ 2.

[14] DOC SOMF ¶ 2; Pl Resp. ¶ 2.  FHS SOMF ¶ 31; Pl. Resp. ¶ 31.  Though Knox disputes that the MTC is in fact a handicap-accessible facility, labeling such contention a "legal question," he does not dispute that the DOC has designated the MTC as handicap-accessible.

[15] DOC SOMF ¶ 12; Pl. Resp. ¶ 12.

[16] Knox SOMF ¶ 11; DOC Resp. ¶ 11; FHS Resp. ¶ 11.

[17] DOC SOMF ¶¶ 115-16; Pl. Resp. ¶¶ 115-16.

which is separated from the modular building by an exterior walkway.[18]  The law library and learning center are both on the second floor of the main building.[19]

The MTC is the DOC's dedicated sex offender treatment facility.[20]  Prisoners at the MTC have access to mental health services, separate and apart from the SOTP.[21]  The SOTP is a rehabilitative program that aims to reduce the risk of sex offenders reoffending and increase a sex offender's ability to successfully reintegrate into society.[22]

When an inmate first arrives at the MTC to participate in the SOTP, they are placed on the South One ("S-1") Unit (on the first floor of the south modular building) in the Assessment and Treatment Preparation Unit ("ATPU").[23]  In the ATPU, an inmate undergoes a comprehensive evaluation, which is an assessment of treatment needs.[24]  The goal of the comprehensive evaluation is to guide and direct treatment, including identification of treatment intensity level and specific, individualized treatment needs.[25]  FHS Policy Number 1.25 states that comprehensive evaluations are to be completed "within 6 months of treatment commencement at the MTC"[26]  but also states that the "timeline of comprehensive evaluations may be extended due to clinical or institutional reasons."[27]  Julius described inmate assessments as an ongoing process.[28]

---

[18] Knox SOMF ¶ 9; DOC Resp. ¶ 9; FHS Resp. ¶ 9.
[19] DOC SOMF ¶ 16; Pl. Resp. ¶ 16.
[20] DOC SOMF ¶ 9; Pl. Resp. ¶ 9.
[21] FHS SOMF ¶ 125; Pl. Resp. ¶ 125.
[22] FHS SOMF ¶ 32; Pl. Resp. ¶ 32.
[23] FHS SOMF ¶ 36; Pl. Resp. ¶ 36.  Knox SOMF ¶ 4; DOC Resp. ¶ 4; FHS Resp. ¶ 4.
[24] FHS SOMF ¶ 36; Pl. Resp. ¶ 36.
[25] FHS SOMF ¶ 37; Pl. Resp. ¶ 37.
[26] Knox SOMF ¶ 13; FHS Resp. ¶ 13 (citing Docket No. 120-5 at 12).  The Court's citation to items in the record is to ECF page numbers rather than any internal pagination.
[27] DOC SOMF ¶ 98; Pl. Resp. ¶ 98.  FHS SOMF ¶ 40 (citing Docket No. 120-5 at 14).
[28] DOC SOMF ¶ 98; Pl. Resp. ¶ 98.

MTC housing is generally determined by demands of treatment needs.[29]  An inmate is recommended for transfer to a nonresidential treatment unit or a residential therapeutic community upon completion of the comprehensive evaluation.[30]  Nonresidential treatment provides a moderate level of treatment and is located on the first floor (North 1).  The residential therapeutic communities provide a high intensity treatment level and are located in second floor housing units (North 2 and South 2).[31]  An inmate's treatment track is rarely changed after the completion of his or her comprehensive evaluation.[32]  FHS may, however, determine an inmate's potential treatment intensity level and recommend the inmate for transfer to a residential therapeutic community or a nonresidential treatment unit prior to the completion of the comprehensive evaluation.[33]

Although it may use FHS's assessment as a guideline for inmate placement, the DOC makes the ultimate decision on housing assignment.[34]  If FHS makes a clinical determination that an inmate should participate in a residential therapeutic community, the DOC typically places that person in either the North 2 or South 2 housing unit depending on bed availability.[35] The MTC has always had the bed space to accommodate an inmate's identification for a specific treatment track.[36]  If an inmate is placed in an alternative unit by the DOC, the inmate may then

---

[29] Knox SOMF ¶ 12; DOC Resp. ¶ 12; FHS Resp. ¶ 12.
[30] FHS SOMF ¶ 41; Pl. Resp. ¶ 41.
[31] FHS SOMF ¶ 44; Pl. Resp. ¶ 44.  Docket No. 125-5 at 18.
[32] Knox SOMF ¶ 16; DOC Resp. ¶ 16; FHS Resp. ¶ 16.
[33] FHS SOMF ¶ 42; Pl. Resp. ¶ 42.
[34] FHS SOMF ¶ 47; Pl. Resp. ¶ 47.  Docket No. 120-5 at 18.
[35] FHS SOMF ¶ 45; Pl. Resp. ¶ 45.
[36] Knox SOMF ¶ 8; DOC Resp. ¶ 8; FHS Resp. ¶ 8.

"satellite" to their treatment program, or live in one unit and travel to another unit to receive treatment.[37]  Satelliting poses no burden to FHS although DOC does not encourage satelliting.[38]

C.  Knox's Placement

Knox entered the SOTP for a variety of reasons, including that sex offender treatment was included on his personal program plan[39] and was frequently a predicate for parole.[40]  From August 2013 to February 2014, Knox was housed in the South 1 unit of the modular building.[41]  On August 13, 2013, Knox signed a DOC Treatment and Agreement Waiver.[42]  On August 14, 2013, Knox signed an Informed Consent to Participate in Treatment form, which indicated that information provided by Knox to the treatment team could be shared with other DOC personnel as well as anyone else with legal authority to view the clinical file.[43]  The confidentiality waiver also states that a member of the SOTP staff explained the limits of confidentiality to Knox.[44]  Knox signed additional confidentiality waivers on February 13, 2014, August 13, 2014 and June 2, 2015.[45]  Knox disputes that he had the full information necessary to make an informed decision before signing the confidentiality waivers.[46]

---

[37] FHS SOMF ¶ 50; Pl. Resp. ¶ 50.
[38] Knox SOMF ¶ 19; DOC Resp. ¶ 19; FHS Resp. ¶ 19.
[39] DOC SOMF ¶ 91; Pl. Resp. ¶ 91.
[40] FHS SOMF Pl. Resp. ¶ 13.
[41] DOC SOMF ¶ 21; Pl. Resp. ¶ 21.
[42] FHS SOMF ¶ 116; Pl. Resp. ¶ 116.
[43] FHS SOMF ¶ 117 (citing Docket No. 120-2 at 1); Pl. Resp. ¶ 117.
[44] FHS SOMF ¶ 117 (citing Docket No. 120-2 at 1); Pl. Resp. ¶ 117.
[45] FHS SOMF ¶¶ 118, 120-21; Pl. Resp. ¶¶ 118, 120-21.
[46] FHS SOMF Pl. Resp. ¶¶ 116-18, 120-21.

1.      Knox Is Placed On The Second Floor

On or about February 11, 2014, Knox was moved to a residential therapeutic community[47] on North 2.[48]  Knox was assigned out of South 1 to North 2 because the DOC requested "bed space." [49]

In late February 2014, Knox met with a member of the FHS treatment team (Janet Cornell) regarding a Therapeutic Community Treatment Plan ("TCTP").[50]  The TCTP lays out treatment targets, psychoeducation classes and behavioral treatment based on clinical assessment at the time of the plan's development.  The TCTP states: "The treatment targets that have been identified are subject to change as additional information becomes available."[51]  At the time the TCTP was prepared, Knox was already housed in the same residential therapeutic community as ultimately recommended by the February 2014 TCTP.[52]  Knox reviewed and signed the TCTP, indicating that he had (i) an opportunity to collaborate with his treatment team to complete the plan; (ii) an opportunity to discuss and ask questions about his treatment program and (iii) an opportunity to discuss his views concerning the plan. [53]  He indicated that he did not have alternative views with respect to portions of the plan.[54]  Knox disputes that his signature suggests that he had all of the information necessary to make an informed decision as to whether to agree to the TCTP.[55]

---

[47] The parties use different names for the residential unit on the second floor of the MTC.  For clarity, the Court will refer to it as the residential therapeutic community.
[48] DOC SOMF ¶ 23; Pl. Resp. ¶ 23.
[49] Knox SOMF ¶ 23.  Docket No. 123-2 at 17.
[50] FHS SOMF ¶ 59; Pl. Resp. ¶ 59.
[51] FHS SOMF ¶ 60; Pl. Resp. ¶ 60.
[52] FHS SOMF ¶ 61; Pl. Resp. ¶ 61.  Docket No. 120-2 at 21.
[53] FHS SOMF ¶¶ 58-59, 62-63, 65; Pl. Resp. ¶¶ 58-59, 62-63, 65.
[54] FHS SOMF ¶ 66; Pl. Resp. ¶ 66.
[55] FHS SOMF Pl. Resp. ¶¶ 58-59.

While housed on North 2, Knox accessed his SOTP psychoeducational classes, support group and primary group in that unit without the use of an elevator.[56] Knox accessed DOC services, including the American Veterans in Prison Program, church, meals, gym and medical services by taking one elevator ride down to the first floor.[57] Knox required the use of one elevator ride down and one elevator ride up in order to access the law library and learning center.[58]

Inmates may use the elevators only with assistance, and no officer is assigned to operate the elevator.[59] In order to use the elevator, Knox communicated with a DOC corrections officer.[60] That corrections officer would then contact another officer that held the elevator key on that shift.[61] The corrections officer with the elevator key then activated the elevator for Knox's use.[62] At times, this process was lengthy.[63] On some occasions, the elevator was not called and Knox was required to return to the officer's desk to call the elevator again.[64] On occasion, Knox would miss meals.[65] Knox stated that he would avoid going to the law library and veterans' meetings because getting there was a "logistical nightmare."[66] Knox testified:

> It's the problem with being delayed and having to ask all the time, the logistical complications that come with it. Like I mentioned, it seems on its face, it sounds like a good idea, just use the elevator, but if you incorporated what I mentioned prior, correctional officers not being there, movement is very short and tailored, being stranded

---

[56] FHS SOMF ¶ 71; Pl. Resp. ¶ 71.
[57] FHS SOMF ¶ 72; Pl. Resp. ¶ 72.
[58] FHS SOMF ¶ 73; Pl. Resp. ¶ 73.
[59] Knox SOMF ¶ 24; DOC Resp. ¶ 24; FHS Resp. ¶ 24.
[60] FHS SOMF ¶ 74; Pl. Resp. ¶ 74.
[61] FHS SOMF ¶ 74; Pl. Resp. ¶ 74.
[62] FHS SOMF ¶ 74; Pl. Resp. ¶ 74.
[63] FHS SOMF ¶ 74; Pl. Resp. ¶ 74.
[64] Knox SOMF ¶ 24. FHS denies this fact as being unsupported by "objective" evidence other than Knox's own statements. See Knox SOMF FHS Resp. ¶ 24. However, Knox's statements under oath are appropriate for the Court's consideration on summary judgment.
[65] DOC SOMF ¶ 41; Pl. Resp. ¶ 41.
[66] Docket No. 120-1 at 39.

– and never mind movements but emergency situations, fire drills. . . .  [I]t's not so much an elevator.  It's what comes along with it.[67]

### 2.   Knox's Reasonable Accommodation Request

On March 4, 2014, Knox filed a Request for Reasonable Accommodation of Special Needs, which stated: "On February 11, 2014, I was moved to North 2 for treatment, however, because of the stairs, I must constantly request the elevator. I miss movements, med calls, long waits and bad feelings from C.O.'s. It has come to a point that I don't want to go out because of a burdensome [sic]."[68]  Knox submitted this request to Nelligan, who denied it on March 12, 2014.[69]  In so doing, Nelligan advised Knox that his "current housing in North 2 is appropriate in terms of your treatment status.  All accommodations with respect to your physical limitations will be performed and are not inconvenient for staff."[70]  In addition, Nelligan stated in an email to DOC staff, "[Knox] is not appropriate for N1, and it looks poor if we consider changing his housing based on an inability to accommodate a medical disability.  I suggest he be interviewed and the situation closely monitored."[71]  Nelligan later testified:

> [S]imply changing his housing would be an admission that we could not accommodate anybody who had a mobility issue, and that was not the case.  We had a reliable means of egress and ingress to the housing units for all individuals who had mobility issues, not just Mr. Knox.[72]

She also explained that DOC maintained Knox's second floor housing assignment not because of appearances but because DOC could accommodate his disability.[73]

---

[67] Knox SOMF ¶ 24; DOC Resp. ¶ 24; FHS Resp. ¶ 24.
[68] DOC SOMF ¶ 28; Pl. Resp. ¶ 28.  Docket No. 123-2.
[69] FHS SOMF ¶ 78; Pl. Resp. ¶ 78.   DOC SOMF ¶ 29; Pl. Resp. ¶ 29.  The request was not submitted to FHS.  FHS SOMF ¶ 77; Pl. Resp. ¶ 77.  Docket No. 123-2 at 39.
[70] DOC SOMF ¶ 31; Pl. Resp. ¶ 31.  Docket No. 123-2 at 39.
[71] Knox SOMF ¶ 25; DOC Resp. ¶ 25; FHS Resp. ¶ 25.
[72] Docket No. 127-4 at 6.
[73] Id.

### 3.   Knox's Grievances

FHS maintains its own grievance process.[74]  The formal FHS grievance process requires inmates to first file an Inmate/Resident Complaint Form within ten business days of the incident.[75]  Inmates may then appeal the response by filing another form within ten business days of the decision.[76]

On March 5, 2014, Knox filed an Inmate/Resident Complaint Form objecting to his placement on the second floor.[77]  After receiving the grievance on April 7, 2014,[78] an FHS staff member replied as follows: "Inmate Knox should address the aforementioned concerns with the Department of Corrections."[79]

On March 21, 2014, Knox filed a DOC grievance, complaining of his continued placement on North 2.[80]  The MTC grievance coordinator responded by stating, "[a]t this facility, you are housed according to your treatment status. Your current unit is appropriate in that regard."[81]

### 4.   The Fire Drill

On April 9, 2014, DOC staff conducted a fire drill on North 2.[82]  The drill began at 7 p.m.[83]  DOC maintains that minutes into the fire drill, corrections officers brought Knox down in the elevator to the area where the other inmates had gathered.[84]  Knox maintains this occurred

---

[74] FHS SOMF ¶¶ 19-20; Pl. Resp. ¶¶ 19-20.  Docket No. 120-3 at 5.
[75] FHS SOMF ¶ 19; Pl. Resp. ¶ 19.
[76] FHS SOMF ¶ 20; Pl. Resp. ¶ 20.
[77] FHS SOMF ¶ 21; Pl. Resp. ¶ 21.
[78] FHS SOMF ¶ 22; Pl. Resp. ¶ 22.
[79] FHS SOMF ¶ 23; Pl. Resp. ¶ 23.
[80] DOC SOMF ¶¶ 36, 40; Pl. Resp. ¶¶ 36, 40.  Docket No. 123-2 at 41.
[81] DOC SOMF ¶ 37; Pl. Resp. ¶ 37.  Docket No. 123-2 at 41.
[82] DOC SOMF ¶ 100; Pl. Resp. ¶ 100.
[83] DOC SOMF ¶ 103; Pl. Resp. ¶ 103.
[84] Knox SOMF ¶ 33; DOC Resp. ¶ 33.

"roughly 14 minutes after the fire drill started."[85]  All inmates and staff were accounted for at

7:14 p.m.[86]

Knox claimed that after the fire drill, he suffered "anxiety,"[87] though he did not file a

grievance in connection with the fire drill.[88]  In the incident report relating to the fire drill, a

corrections officer noted: "having an inmate in a wheelchair on the second floor of any unit

should be reevaluated."[89] DOC Defendants O'Brien, Nelligan and Bennett disagreed.[90]

Corrections Officer Holmes stated that while an elevator was used in the drill, in an actual fire,

Knox would have been carried down by two corrections officers in a stair chair.[91]

### 5.   Knox Moved To First Floor

On May 7, 2014, FHS staff member Cornell, met with Knox because Knox had been

absent from group sessions and community meetings.[92]  Knox informed Cornell that he no

longer wished to participate in treatment in hopes that his request to be moved to the first floor

would be granted.[93]  FHS maintains that Knox "self-terminated" from the SOTP on May 8,

2014.[94]  As a result of his "self-termination," Knox was moved back to the South 1 orientation

unit on the first floor of the modular building.[95]  Knox expressed that he felt "for loss of a better

term, normal" while on the first floor.[96]

---

[85] Knox SOMF ¶ 33; DOC Resp. ¶ 33.
[86] DOC SOMF ¶ 103; Pl. Resp. ¶ 103.
[87] DOC SOMF ¶ 118; Pl. Resp. ¶ 118.
[88] DOC SOMF ¶ 106; Pl. Resp. ¶ 106.
[89] Knox SOMF ¶ 34; DOC Resp. ¶ 34; FHS Resp. ¶ 34.
[90] DOC SOMF ¶¶ 112-14; Pl. Resp. ¶¶ 112-14.
[91] DOC SOMF ¶ 115; Pl. Resp. ¶ 115.  Knox SOMF DOC Resp. ¶ 34.  Docket No. 123-2 at 80-81.
[92] FHS SOMF ¶ 86; Pl. Resp. ¶ 86.
[93] FHS SOMF ¶ 86; Pl. Resp. ¶ 86.
[94] Knox SOMF ¶ 29; DOC Resp. ¶ 29; FHS Resp. ¶ 29
[95] FHS SOMF ¶ 89; Pl. Resp. ¶ 89.  DOC SOMF ¶ 128.
[96] FHS SOMF ¶ 109; Pl. Resp. ¶ 109.

On May 12, 2014, Prisoners' Legal Services, on Knox's behalf, wrote to Nelligan regarding Knox's concerns about second floor housing.[97]  Nelligan responded to the concerns.[98]  However, at the time Nelligan received the letter, Knox had already "self-terminated" from the SOTP, the consequence of which was relocation to the first floor.[99]

      6.     <u>Knox Reenters The SOTP And Refuses To Move To The Second Floor</u>

Typically, when an inmate reenters treatment after a "self-termination," he remains on the orientation unit for a period of time to show commitment, then returns to his originally designated treatment intensity level.[100]  Knox sought to reenter treatment on or around August 13, 2014, beginning in the orientation unit on the first floor.[101]

On February 23, 2015, a DOC corrections officer ordered Knox to move to the second floor,[102] "to continue his treatment program."[103]  Knox refused the order, stating, "I just declined while I was still on the ground floor, accepting the sanctions from the DOC and suspension from FHS.  That seemed a more likely route than dealing with the elevator."[104]  Per its policy, FHS then suspended Knox from the SOTP for 90 days, labelling his refusal to move as a "treatment refusal," and making him eligible for reentry into the treatment program on May 24, 2015.[105]

---

[97] Knox SOMF ¶ 26; DOC SOMF ¶ 26; FHS SOMF ¶ 26.
[98] Docket No. 127-21 at 2.
[99] FHS SOMF ¶ 89; Pl. Resp. ¶ 89.  DOC SOMF ¶ 128.  The record does not include the exact date that Knox was relocated to the first floor after his "self-termination" on May 8, 2014.
[100] FHS SOMF ¶¶ 91, 93; Pl. Resp. ¶¶ 91, 93.
[101] FHS SOMF ¶ 94; Pl. Resp. ¶ 94.
[102] FHS SOMF ¶ 95; Pl. Resp. ¶ 95.
[103] FHS SOMF ¶ 96.  Docket No. 120-2 at 11.
[104] FHS SOMF ¶ 95; Pl. Resp. ¶ 95.  Knox SOMF ¶ 30; DOC SOMF ¶ 30; FHS SOMF ¶ 30.
[105] FHS SOMF ¶¶ 97-98; Pl. Resp. ¶¶ 97-98.

7.      Knox Files A Second Grievance With FHS

On March 4, 2015, Knox filed an Inmate/Resident Complaint Form regarding the February 23, 2015 order, his refusal and his subsequent suspension from the program.[106]  He maintained that he was being discriminated against as a result of his disability.[107]  Knox described this grievance as an appeal of his previous March 5, 2014 grievance.[108]  In her March 9, 2015 response, Julius stated: "Please contact DOC with any issues or questions related to housing and HSU medical staff with any medical issues."[109]

On May 24, 2015, Knox wrote a letter expressing his desire to return to treatment, and reentered treatment shortly thereafter.[110]

8.      Knox's Comprehensive Evaluation Is Completed

On August 4, 2015, prior to the completion of Knox's comprehensive evaluation, he was transferred from the ATPU to the nonresidential treatment unit on the first floor.[111]  On September 4, 2015, FHS completed Knox's comprehensive evaluation, which concluded that he was appropriately placed in the nonresidential treatment unit.[112]  On October 17, 2015, FHS completed Knox's annual treatment plan, which recommended that Knox remain in the nonresidential treatment unit.[113]  In total, Knox spent approximately four months of his stay at

---

[106] FHS SOMF ¶ 24; Pl. Resp. ¶ 24.  Exhibit 120-2 at 13-15.
[107] FHS SOMF ¶ 24; Pl. Resp. ¶ 24.  Exhibit 120-2 at 13-15.
[108] FHS SOMF ¶ 27; Pl. Resp. ¶ 27.
[109] FHS SOMF ¶ 26; Pl. Resp. ¶ 26.
[110] FHS SOMF ¶¶ 100-01; Pl. Resp. ¶¶ 100-01.
[111] FHS SOMF ¶ 102; Pl. Resp. ¶ 102.  Knox SOMF FHS Resp. ¶ 16.
[112] Knox SOMF ¶ 31; DOC Resp. ¶ 31; FHS Resp. ¶ 31.
[113] FHS SOMF ¶ 107; Pl. Resp. ¶ 107.

the MTC on the second floor.[114]  There were no other wheelchair-bound inmates on the second

floor of the MTC during times relevant to the instant dispute.[115]

      D.   Alleged Retaliation Following Filing Of Grievances And This Case

      1.   Denial Of Medical Supplies And Stamps

In April 2014, Knox filed a request to transfer $25.00 from his inmate savings account to

his inmate personal account for stamps and "personal hygiene" products.[116]  Defendant Bennett

denied the April 2014 request as "not deemed compelling as [DOC] provides hygiene products

[and] permit[s] those indigent to mail 3 letters weekly."[117]

On July 30, 2014, Knox filed another formal grievance related to his requests for stamps

and cosmetics.[118]  In that grievance, Knox complained about the indigent/not indigent

determination and his ability to transfer money from his savings account.[119]  In response, on

August 1, 2014, Knox was told to resubmit his request for transfer of funds for stamps.[120]

On August 1, 2014, Knox apparently filed an informal complaint regarding insufficient

hygiene supplies in his indigence kit.[121]  On August 20, 2014, in response, Bennett wrote that

Knox had "not inquired about receiving additional indigence supplies."[122]  Bennett also

counseled Knox: "when needed, don't hesitate to speak with your unit CPO [correctional

program officer] about receiving additional indigence supplies . . . I encourage you to meet and

---

[114] FHS SOMF ¶ 108; Pl. Resp. ¶ 108.
[115] FHS SOMF ¶ 111; Pl. Resp. ¶ 111.
[116] DOC SOMF ¶¶ 147-48; Pl. Resp. ¶¶ 147-48.  Docket No. 123-2 at 73.
[117] DOC SOMF ¶ 149; Pl. Resp. ¶ 149.  Docket No. 123-2 at 73.
[118] Docket No. 123-2 at 59.
[119] Id.
[120] Id.
[121] A copy of this document is not apparently in the record before the Court.  However, the letter responding to it is.
[122] DOC SOMF ¶ 152; Pl. Resp. ¶ 152.  Docket No. 123-2 at 96.

speak with medical staff regarding any medical issues of concern so they may assess and address your medical needs."[123]

On October 3, 2014, in response to Knox's July 30th grievance, DOC asked him to "resubmit your request for transfer of funds for stamps."[124]  Knox filed an inmate grievance appeal form on October 17, 2014, in which he wrote: "[O]n [July] 7, 2014, I had requested to transfer funds from my savings to personal account in order to purchase cosmetics/stamps for mail and proper hygiene . . . This request was DENIED even though the Grievance was 'APPROVED' by DOC."[125]  On November 3, 2014, Defendant O'Brien partially approved "the transfer of funds for stamps only."[126]

Knox made an appointment to see a nurse in the HSU to discuss "emollient" for a wound on his leg and a sore on his buttock, because "DOC will not let me purchase any lotion."[127]  He then refused to be seen for this issue.[128]  Knox's request for personal toiletries was approved in November 2014.[129]

2.   Reclassification

On May 22, 2015, Knox filed a motion for preliminary injunction and order directing the Defendants to, inter alia, maintain his assignment to a ground floor housing unit at the MTC.[130] At that time, Defendants agreed not to move Knox from the first floor until the motion was decided.[131]  In particular, DOC agreed not to change Knox's housing pending the disposition of

---

[123] DOC SOMF ¶ 152; Pl. Resp. ¶ 152.
[124] Knox SOMF ¶ 56; DOC Resp. ¶ 56.  Docket No. 123-2 at 59.
[125] Docket No. 123-2 at 75.
[126] Id.
[127] DOC SOMF ¶ 153; Pl. Resp. ¶ 153.  Docket No. 123-2 at 75.
[128] DOC SOMF ¶ 154.  Docket No. 123-2 at 74.
[129] Knox SOMF ¶ 56; DOC Resp. ¶ 56.
[130] Docket No. 69.
[131] Id. at 1 n.1.

the motion.[132]  On May 22, 2015, a DOC official sent an email to DOC and FHS staff stating that Knox's unit was not to be changed until further notice or approval: "If he becomes involved with treatment, he will be a satellite. . ."[133]

Knox's suspension from treatment ended on May 24, 2015.[134]  A reclassification hearing was held for Knox on May 29, 2015 and he was reclassified to MCI Shirley, a different DOC facility.[135]  Shortly thereafter, Bennett emailed DOC officials, informing them of Knox's reclassification, but stating, "Nonetheless, I will have it modified for him to remain [at the MTC] as long as he stays treatment compliant."[136]  Knox ultimately was not moved out of the MTC until he left DOC custody on November 16, 2016.[137]

III.   ANALYSIS

A.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted).  A material fact is one which has "the potential to affect the outcome of the suit under the applicable law."  Id.  (quotations and citations omitted).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants,

---

[132] Id.
[133] Knox SOMF ¶ 46; DOC Resp. ¶ 46.
[134] Docket No. 69 at 1 n.1.
[135] Knox SOMF ¶ 47; DOC Resp. ¶ 47.
[136] Docket No. 127-25 at 2.
[137] DOC SOMF ¶ 2; Pl. Resp. ¶ 2.  Knox SOMF ¶ 49; DOC Resp. ¶ 49.

who are entitled to the benefit . . . of all reasonable inferences therefrom." <u>Ahern</u>, 629 F.3d at 53-54 (citing <u>Cox</u>, 391 F.3d at 29).  "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." <u>Id.</u> (citations omitted).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*." <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted).  "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Id.</u>  "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." <u>Estate of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.")).

B.  <u>Disability Discrimination Claims (Counts 1-3)</u>

Knox asserts that the DOC and FHS[138] violated the ADA and Article 114 of the Massachusetts Constitution, and that DOC alone violated the Rehabilitation Act, by housing

---

[138] At oral argument, Knox counsel clarified that he is not pursuing disability discrimination claims against the individual defendants.  Indeed, individuals are not subject to liability under these statutes.  <u>See</u> <u>Mitchell v. Mass. Dept. of Corr.</u>, 190 F. Supp. 2d 204, 211 (D. Mass. 2002) (collecting cases).  Further, Knox clarified that he is not pursuing a Rehabilitation Act claim against FHS.  In any event, there is no record evidence that FHS receives federal funds for purposes of establishing its liability under the Rehabilitation Act. <u>See</u> 29 U.S.C. § 794 (Rehabilitation Act applies to programs that receive "Federal financial assistance.").  At oral argument, Knox also clarified that despite statements in the amended complaint to the contrary, <u>see</u> Amended Compl. ¶ 88, he is not pursuing ADA Title III claims against FHS.  Accordingly, summary judgment should be granted to the individual defendants on Counts 1, 2, and 3 and FHS on Count 3.

Knox on the second floor, and subsequently, causing his exclusion from services, programs and activities at the MTC.[139]

Title II of the ADA prohibits disability discrimination by public entities.  42 U.S.C. §§ 12131(1)(B), 12132.[140]  Under Title II, a plaintiff must establish: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000).

A plaintiff may press several different types of disability discrimination claims: (1) disparate treatment on account of disability; (2) disparate impact; and (3) failure to accommodate.  Knox alleges only a failure to accommodate.  See Docket No. 126 at 8-14. Accordingly, he must prove that "a public entity has refused to affirmatively accommodate his . . . disability where such accommodation was needed to provide meaningful access to a public service."  Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 145 (1st Cir. 2014) (internal citations omitted).  A plaintiff pursuing such a claim "need not directly address and satisfy the elements or methods for proving" the disparate impact and disparate treatment theories.  Id.

The Defendants do not dispute that Knox is a qualified individual with a disability.  See Docket Nos. 119 at 5; 123 at 3. The parties disagree, however, whether the Defendants are even

---

[139] Because Article 114, the Rehabilitation Act and the ADA are construed alike, see Guckenberger v. Bos. Univ., 974 F. Supp. 106, 150 (D. Mass. 1997), the Court addresses these claims together.
[140] To the extent Knox seeks punitive damages under Title II and the Rehabilitation Act, such request should be denied.  See Barnes v. Gorman, 536 U.S. 181, 190 (2002).

subject to liability,[141] and if they are, whether Knox was (1) denied the benefits of MTC's

services and whether (2) such denial was by reason of Knox's disability.

> 1.   Denial Of Access To Services

To meet his burden, Knox must provide evidence that he was excluded from participation

in or denied the benefits of "the services, programs, or activities of a public entity."  42 U.S.C. §

12132.  Title II obligates DOC officials "to make 'reasonable accommodations' to allow [a]

disabled person access to [prison] services or participation in programs or activities" but it does

not require them "to employ any and all means to make services available to persons with

disabilities."  Bibbo v. Mass. Dep't of Corr., No. 08-10746-RWZ, 2010 WL 2991668, at *1 (D.

Mass. July 26, 2010) (citation omitted).  They need only provide "meaningful access to the

program or services sought."  Id. (citation omitted).  The ADA entitles plaintiffs "to reasonable

accommodations, not to optimal ones finely tuned to [the plaintiff's] preferences."  Nunes, 766

F.3d at 146.  Further, "[i]nmates do not have a right to be housed at a specific facility or in a

specific type of housing."  Parks v. Blanchette, 144 F. Supp. 3d 282, 339 (D. Conn. 2015) (citing

Meachum v. Fano, 427 U.S. 215, 224-25 (1976)).

In the four months Knox was housed on the second floor of the MTC,[142] he was not

denied "meaningful access".  It is undisputed that Knox was able to access services, including

meals, gym, and medical services, on the ground floor of the modular building and in the main

---

[141] FHS argues that it is not subject to liability because it is not a public entity and because Knox
has not exhausted FHS' administrative remedies.  Docket No. 119 at 2-4, 10-11.  DOC argues that
it is not subject to ADA liability by virtue of the Eleventh Amendment.  Docket No. 157.  Because
this Court recommends summary judgment for the Defendants on the merits of Knox's disability
discrimination claims, it does not address these arguments.

[142] The Court notes that the focus of Knox's disability discrimination claims is these four months.
See Docket No. 126 at 8 ("Knox . . . was excluded from the services, programs, and activities at
MTC while housed on the second floor . . .").  Knox is not claiming any disability discrimination,
other than potentially his retaliation claims, while he was housed on the first floor.

building with the use of an elevator.[143]  It is also undisputed that while on the second floor, he

accessed his SOTP psychoeducational classes, support group and primary group without the use

of an elevator.[144]

The need for a corrections officer's assistance to operate the elevator does not change

these facts.  Instead, access to the MTC's services was merely more inconvenient for Knox when

housed on the second floor.[145]  At times, Knox would forego certain activities because he did not

want to have to ask for help with the elevator.[146]  This was Knox's choice, and as such, cannot be

grounds for an ADA violation on part of the DOC.  See Polansky v. N.H. Dep't of Corr., No. 12-

cv-105-PB, 2013 WL 1398582, at *12 (D.N.H. Mar. 25, 2013) (holding that prisoner's

preference for one procedure did not render a second an unreasonable accommodation so long as

it granted prisoner access to services).

Knox also argues that he was denied meaningful access to emergency services.  Docket

No. 126 at 19; Docket No. 134 at 8.  Knox focuses on an April 9, 2014 fire drill, during which he

was initially left behind and then brought down from the second floor by elevator.[147]  Construing

the facts in the light most favorable to Knox, the Court acknowledges that Knox found the fire

drill to be anxiety-provoking.[148]  The Court also acknowledges that there was discussion among

DOC officials after the fire drill as to whether wheelchair-bound inmates should be housed on

the second floor.[149]  However, this single incident is simply not enough to show a lack of

---

[143] FHS SOMF ¶ 72; Pl. Resp. ¶ 72.
[144] FHS SOMF ¶ 71; Pl. Resp. ¶ 71.
[145] FHS SOMF ¶ 75; DOC SOMF ¶ 133.
[146] See FHS SOMF ¶ 75.
[147] DOC SOMF ¶¶ 100, 103; Pl. Resp. ¶¶ 100, 103.  Knox SOMF ¶ 33; DOC Resp. ¶ 33.
[148] DOC SOMF ¶ 118; Pl. Resp. ¶ 118.  There is also evidence in the record that shows that
Knox also thought it was a funny moment.  DOC SOMF ¶ 105; Pl. Resp. ¶ 105.
[149] DOC SOMF ¶¶ 112-14; Pl. Resp. ¶¶ 112-14.  Docket No. 123-2 at 76-78.

meaningful access to emergency services.  See, e.g., Holmes v. Godinez, 311 F.R.D. 177, 206-07, 226-28, 235-36 (N.D. Ill. 2015) (denying defendant's motion for summary judgment on ADA claims where numerous inmates with disabilities were not evacuated during multiple fire drills).  In addition, there is no dispute that in an emergency inmates in wheelchairs may be taken downstairs in a stair chair.[150]  Docket No. 144 at ¶ 6.  Knox has offered nothing other than his own opinion and some musings by corrections officers that this method of evacuation is not sufficient to meet DOC's important obligations in this regard.

Accordingly, Knox was not denied meaningful access to the MTC's programs, services and activities.

### 2.    Denial Of Access To Services Because Of Disability

Knox's ADA claims also fail because no reasonable fact-finder could conclude that his placement on the second floor and subsequent refusal to grant his March 2014 request for reasonable accommodation occurred because he is wheelchair bound.  "While proof of disparate impact is not required to state a reasonable modification claim, there must be something different about the way plaintiff is treated by reason of his disability such that he does not have access to benefits available to those without disabilities."  Parks, 144 F. Supp. 3d at 338-39.

If FHS makes a clinical determination that an inmate should participate in a residential therapeutic community, the DOC typically places that person in a second floor housing unit depending on bed availability.[151]  The Defendants have produced evidence that Knox's placement on the second floor was based on Knox's treatment needs.[152]  Indeed, FHS made two

---

[150] DOC SOMF ¶¶ 115-16; Pl. Resp. ¶¶ 115-16.
[151] FHS SOMF ¶ 45; Pl. Resp. ¶ 45.
[152] FHS SOMF ¶ 54; Pl. Resp. ¶ 54.

clinical determinations (in February 2014[153] and February 2015[154]) that Knox's needs were best served at those times on the second floor.  Further, the denial of his request for reasonable accommodation is supported by evidence of legitimate penological interests.[155]  The denial indicated that there was a medical order supporting his special need.[156]  The denial further stated that "your current housing in North 2 is appropriate in terms of your treatment status.  All accommodations with respect to your physical limitations will be performed and are not inconvenient for staff."[157]

Knox disputes this evidence by stating that at the time he was placed on the second floor, his comprehensive evaluation had not yet been completed,[158] and upon its completion, FHS recommended him for placement on the first floor.[159]  He also argues that this treatment during the April 9, 2014 fire drill compelled the need for his transfer to the first floor.  Docket No. 126 at 8-10.  However, this evidence does not change the fact that Knox was placed on the second floor after a clinical evaluation (albeit, not the comprehensive evaluation) recommended his placement there.  Further, the FHS policy in question explicitly includes the contingency that comprehensive evaluations may be delayed for clinical or institutional reasons.[160]  Knox has not produced any evidence that the delay in completion of his comprehensive evaluation was the product of discrimination.  Nor has he disputed the bona fides of the February 2014 and February 2015 evaluations.  Indeed, he has presented no evidence that his second floor placement was

[153] See FHS SOMF ¶ 61.  Docket No. 120-2 at 22.
[154] See FHS SOMF ¶ 96.  Docket No. 120-2 at 13.
[155] For this reason, the Court does not address Knox's argument that "satelliting" (living on the first floor and receiving treatment on the second) was a reasonable accommodation.
[156] Docket No. 127-16.
[157] Id.
[158] DOC SOMF ¶ 23; Pl. Resp. ¶ 23.  FHS SOMF ¶ 103; Pl. Resp. ¶ 103.
[159] Knox SOMF ¶ 31; DOC Resp. ¶ 31; FHS Resp. ¶ 31.
[160] See FHS SOMF ¶ 40; Docket No. 120-5 at 4.

because of his disability, nor has he provided evidence that the Defendants manufactured a

penological rationale for his placement on the second floor and the subsequent denial of his

reasonable accommodation request.

Accordingly, the Court recommends that the DOC and FHS Defendants be granted

summary judgment on Counts 1-3.

C.   Retaliation Under The ADA (Count 4)

Knox alleges retaliation by the DOC[161] in violation of the ADA for the filing of this

lawsuit and the grievances that preceded it.  For the reasons discussed below, the Court

recommends that summary judgment be granted for the DOC on Count 4.

Title V of the ADA provides that "[n]o person shall discriminate against any individual

because such individual has opposed any act or practice made unlawful by this chapter or

because such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "A plaintiff

may assert a claim for retaliation, even where the underlying claim for disability discrimination

fails."  Colon-Fontanez v. Municipality of San Juan, 671 F. Supp. 2d 300, 331 (D.P.R. 2009)

(citing Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)).

"A retaliation claim under the ADA is analyzed under the familiar burden-shifting

framework drawn from cases arising under Title VII."  Kelley v. Corr. Med. Servs., Inc., 707

F.3d 108, 115 (1st Cir. 2013).  To establish a prima facie case of retaliation under 42 U.S.C. §

12203(a), a plaintiff must show that (1) he engaged in protected conduct, (2) he was subjected to

an adverse action by the defendant, and (3) there was a causal connection between the protected

---

[161] At oral argument, Knox clarified that he is only pursuing a retaliation claim against the DOC.
Accordingly, summary judgment on Count 4 should be granted for all individual defendants and
FHS on this basis alone.

conduct and the adverse action.  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir.

2012) (citations omitted).  "Once a plaintiff makes such a showing, the burden shifts to the

defendant to articulate a legitimate, non-retaliatory explanation for the adverse action."  Id.  If

the defendant articulates such a reason, "the burden shifts back to the plaintiff to show that the

proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a

retaliatory animus."  Id.

Inmates are of course not deprived of constitutional protections.  Greater restrictions of

such rights, however, are allowed in prison than would be allowed elsewhere.  See Turner v.

Safley, 482 U.S. 78, 84-85 (1987).  Additionally, courts "must accord substantial deference to

the professional judgment of prison administrators, who bear a significant responsibility for

defining the legitimate goals of a correction system and for determining the most appropriate

means to accomplish them."  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).  "Courts properly

approach prisoner retaliation claims with skepticism and particular care because virtually any

adverse action taken against a prisoner by a prison official – even those otherwise not rising to

the level of a constitutional violation – can be characterized as a constitutionally proscribed

retaliatory act.  Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (citations omitted).

The DOC does not appear to dispute that Knox engaged in protected conduct by filing

grievances and the instant lawsuit.  Indeed, the case law makes clear that such conduct is

protected.  See Brown v. Corsini, 657 F. Supp. 2d 296, 305 (D. Mass. 2009) (grievances);

Schofield v. Clarke, 769 F. Supp. 2d 42, 47 (D. Mass. 2011) (grievances and lawsuits).  Rather,

the DOC argues that Knox is unable to satisfy his burden of proof that the subject events were

"adverse actions" or that the actions took place as a result of retaliatory intent.

Knox focuses on two "adverse actions": (1) the temporary denial of his request to purchase stamps and toiletries from his personal account; and (2) his reclassification. Docket No. 126 at 14-16.

An "adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination." Isaacs v. Dartmouth-Hitchcock Med. Ctr., No. 12-cv-040-LM, 2014 WL 1572559, at *19 (D.N.H. Apr. 18, 2014).[162] Anti-retaliation provisions protect an individual from conduct that causes injury or harm. See Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006) (analyzing ADA retaliation claim under Title VII principles). For example, adverse actions in the prison context include a change in work assignment that affects wages, benefits, and good time credits, Brown, 657 F. Supp. 2d at 305, and transfer to a higher security prison, Partelow v. Massachusetts, 442 F. Supp. 2d 41, 51 (D. Mass. 2006). See also Thaddeus-X v. Blatter, 175 F.3d 378, 396, 398 (6th Cir. 1999) (segregation constitutes adverse action). In other words, any decision "causing a significant change in benefits" may constitute an adverse action for the purposes of a retaliation claim. Pierce v. District of Columbia, 128 F. Supp. 3d 250, 282 (D.D.C. 2015)(citations omitted).

An act must be more than de minimis to constitute an adverse action. For example, the First Circuit has held that a delay in providing accommodations to a disabled person which results in mere inconvenience rather than significant injury or harm does not amount to an adverse action. See Carmona-Rivera, 464 F.3d at 20. Similarly, a mere delay or lack of cooperation in providing inmates with writing implements did not support a claim for retaliation.

---

[162] The Isaacs court analyzed a claim of retaliation under the Rehabilitation Act. However, the "standard for retaliation claims under the Rehabilitation Act is the same as the standard under the ADA." Esposito, 675 F.3d at 41. Therefore, the Court relies on Rehabilitation Act and ADA cases in its analysis.

Partelow, 442 F. Supp. 2d at 51.  See Thaddeus-X, 175 F.3d at 399 (cold meals and harassment

may not pose the requisite deterrent effect).  Here, the Court finds that, even viewing the facts in

the light most favorable to Knox, a reasonable jury would not conclude that the cited conduct

here constituted adverse actions.

           1.     Denial Of Request To Transfer Money

Knox contends that the DOC retaliated against him by denying his request to transfer

money from his savings account to his personal account for the purchase of stamps and toiletries.

Docket No. 126 at 15.  Pursuant to Massachusetts law, and in order to ensure that inmates will

have a balance of funds when they leave DOC custody, money may be removed from an inmate

savings account only upon a showing of compelling need.  103 Mass. Code Regs. 405.07 (3).

Indeed, the form itself states that "[s]avings funds may only [be released] upon approval of the

Superintendent for compelling needs."  Docket No. 123-2 at 73. (emphasis in original).  The

decision whether to allow an inmate to expend earned savings and/or personal funds is within the

discretion of the superintendent.  M.G.L. c. 127, § 48A; 103 Mass. Code Regs. 405.07 (3).

However, the superintendent's discretion to authorize money transfers is not absolute and he may

not act arbitrarily in denying such a request.  See Nilsson v. Superintendent, N. Cent. Corr. Ins.,

No. 10-P-356, 2011 WL 722611, at *1 (Mass. App. Ct. Mar. 3, 2011).

In or about June 2014,[163] Knox submitted his request which was initially denied.[164] The

reason for the denial was as follows:  "Not deemed compelling as the department provides

hygiene products/permit those indigent to mail 3 letters weekly."  Docket No. 123-2 at 73.  Knox

and the DOC agree that his requests for stamps and toiletries ultimately were approved in

---

[163] While both Knox and the DOC agree that the request was submitted in June 2014, Knox SOMF
¶ 56; DOC Resp. ¶ 56, the document itself is dated April 2014.  Docket No. 123-2 at 73.
[164] Knox SOMF ¶ 56; DOC Resp. ¶ 56.

October 2014 and November 2014, respectively.[165]  Based on the evidence before the Court, no reasonable jury could conclude that the four to five month delay in approving Knox's request for transfer of money is an adverse action.  He received stamps for three letters a week and has not described any harm resulting from DOC not promptly authorizing money for more stamps.  In addition, he has not provided any evidence that delay in approving his funds for cosmetics resulted in any harm to him.  In August, in addition to his month's worth of hygiene products, Knox was told to inquire with his unit about the possibility of receiving additional indigence supplies.  Docket No. 123-2 at 73.  In October, in response to a medical request for cream because he could not purchase lotion, he was given an appointment but refused to be seen. Docket No. 123-2 at 74.  While the non-approval of creams in certain circumstances could support a finding of adverse action, Knox simply has not made that case here.  Indeed, he has not alleged any concrete harm that resulted from the denial of the transfer of funds.  Accordingly, there is little indication that the actions of the DOC Defendants here would have the "chilling effect of deterring others from filing" their own grievances; Knox's requests were ultimately approved.  See Carmona-Rivera, 464 F.3d at 20.  While no doubt annoying to Knox, no reasonable jury could find that the delay was an adverse action based on the evidence before the Court.

Knox has provided no evidence other than his own opinion that the DOC Defendants denied his requests in retaliation for the filing of the instant suit.  And though the record is less than clear as to the chronology of subsequent denials and eventual approval of such requests, Knox's dissatisfaction with the delay does not alone create an actionable harm.

---

[165] Knox SOMF ¶ 56; DOC Resp. ¶ 56.

2.    Reclassification

Knox also argues that a May 2015 reclassification hearing was an adverse action.  Docket No. 126 at 15.  The hearing was held on May 29, 2015 after his suspension from treatment ended on May 24, 2015.  Docket No. 69 at 1 n.1.  As a result Knox was reclassified from MTC to MCI Shirley.[166]  The hearing occurred just one week after Knox filed a preliminary injunction motion to prevent his transfer to the second floor and after the parties agreed that he would not be moved pending resolution of the motion.  Knox's housing was not actually changed as a result of the hearing.  Indeed, Knox remained on the first floor of the MTC until he left DOC custody in November 2016.[167]

Knox has not alleged any harm from the hearing itself.  Indeed, there is no description in the record as to Knox's role in the hearing, if any.  While the hearing alone could conceivably cause harm in and of itself, Knox has not put forth evidence of any such facts.  Without that, and given that Knox was not actually transferred, no reasonable jury could conclude that the hearing alone was an "adverse action".

Accordingly, the Court recommends that summary judgment be granted in favor of the DOC Defendants on Count 4.

D.  Constitutional Violations

Pursuant to 42 U.S.C. § 1983, Knox alleges that the individual defendants violated his rights (1) under the Eighth Amendment by depriving him of medically necessary therapeutic care and by their requirement that he sign a confidentiality waiver to receive treatment; (2) under the

---

[166] Knox SOMF ¶ 47; DOC Resp. ¶ 47.
[167] DOC SOMF ¶ 2; Pl. Resp. ¶ 2.

Fourteenth Amendment by assigning him to a second floor housing unit; and (3) under the

Fourteenth Amendment by denying his grievances.

Section 1983 is a vehicle through which individuals may sue certain persons acting under

the color of state law for deprivation of federally assured rights.  Gagliardi v. Sullivan, 513 F.3d

301, 306 (1st Cir. 2008).  Specifically, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory or the District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 is "not itself a source of substantive rights, but merely provides a method

for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94

(1989) (internal quotation marks and citations omitted).  "A claim under Section 1983 has two

essential elements. First, the challenged conduct must be attributable to a person acting under

color of state law" and "second, the conduct must have worked a denial of rights secured by the

Constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  None of

the individual defendants for purposes of summary judgment contest that they were acting under

color of state law.

Here, there are a number of legal impediments to Knox's claims as set forth below.

### 1.      Lack Of Individual Liability

Because there is no vicarious liability under Section 1983, a plaintiff must establish that

each defendant's individualized conduct violated the Constitution.  Rua v. Glodis, 52 F. Supp. 3d

84, 94 (D. Mass. 2014), appeal docketed, No. 14-2158 (1st Cir. 2014).

Further, government officials may not be held liable for the unconstitutional conduct of their subordinates under Section 1983 under a theory of respondeat superior. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Absent participation in the challenged conduct, a supervisor may be held liable for constitutional violations only if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence, or gross negligence of the supervisor amounting to deliberate indifference. Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008). In other words, a supervisor's action or inaction must be a proximate cause of the constitutional violation. See Rua, 52 F. Supp. 3d at 94. Causation may be satisfied if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). Causation may also be satisfied if there is a long history of widespread abuse sufficient to alert a supervisor to ongoing violations and the supervisor fails to take corrective action. Id.

With respect to Commissioner Higgins-O'Brien, there are no allegations that she was personally involved in any of the actions alleged in the Amended Complaint. Further, there are no facts linking her directly to any of the actions taken by any of the other individual defendants concerning Knox. Rather, Knox offers only the following: "[S]he had power and control over her subordinates."[168] Such an allegation is simply not enough to establish individual liability under Section 1983 either individually or in a supervisory capacity. It is a conclusory assertion

---

[168] DOC SOMF ¶ 69; Pl. Resp. ¶ 69. This statement of fact relates only to Knox's allegation with respect to Higgins-O'Brien's deliberate indifference. There are no other allegations in the record with respect to her individual actions and any of the other claims for constitutional violations.

devoid of any linkage between Higgins-O'Brien to acts or omissions by her subordinates. Accordingly, summary judgment should be granted on this basis alone to Higgins-O'Brien on Counts 5, 6, 7, 8, and 9.

2.     <u>Cruel And Unusual Punishment (Counts 5 and 6)</u>[169]

Knox argues that his Eighth Amendment rights were violated because he was denied "medically necessary care attributable to the requirement that inmates waive confidentiality in treatment." Docket No. 134 at 14; <u>see also</u> Docket No. 137 at 13.

Deliberate indifference to a prisoner's serious illness or injury states a cause of action for violation of the Eighth Amendment under Section 1983. <u>Estelle v. Gamble,</u> 429 U.S. 97, 105 (1976). To establish an Eighth Amendment violation, Knox "must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." <u>Kosilek v. Spencer</u>, 774 F.3d 63, 82 (1st Cir. 2014) (citing <u>Estelle</u>, 429 U.S. at 106; <u>Sires v. Berman</u>, 834 F.2d 9, 12 (1st Cir. 1987)).

A medical need is "serious" if it is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Id.</u> (citing <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990)). "This prong does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." <u>Id.</u> (citing <u>United States v. Derbes</u>, 369 F.3d 579, 583 (1st Cir. 2004)).

---

[169] Knox also alleges a violation of Article 26 of the Massachusetts Constitution. Amended Compl. ¶¶ 118-21. "Because Article 26 and the Eighth Amendment guarantee essentially the same scope of rights, there is no need for separate analyses." <u>Carter v. Symmes</u>, No. 06-10273-PBS, 2008 WL 341640, at *5 n.3 (D. Mass. Feb. 4, 2008). Accordingly, the Court addresses these claims together.

An Eighth Amendment claim based on medical mistreatment also requires more than "an inadvertent failure to provide adequate medical care" and must involve "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir. 2006) (quoting Estelle, 429 U.S. at 105-06). Deliberate indifference "may be manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05 (citations omitted). Knox can demonstrate deliberate indifference only if the medical attention he received is "so clearly inadequate as to amount to a refusal to provide essential care" and must be "so inadequate as to shock the conscience." Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (citations omitted). Mere negligence or medical malpractice does not establish deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 835 (1994); Estelle, 429 U.S. at 104. Moreover, failure to provide access to rehabilitative programming does not violate the Eighth Amendment. Fiallo v. De Batista, 666 F.2d 729, 730 (1st Cir. 1981).

Here, Knox has not made the requisite showing. It is undisputed that the sex offender treatment program here is rehabilitative.[170] Nevertheless, Knox claims that sex offender treatment is medically necessary for him. Docket No. 134 at 14. He has not provided any medical opinions to that effect. Rather, he argues that the treatment is necessary because it is "frequently made a predicate to parole." Id. However, Knox has made no argument, or offered any evidence, that it was a predicate for his parole.

---

[170] FHS SOMF ¶ 32; Pl. Resp. ¶ 32. The Court notes that to the extent Knox's claim involves interference with rehabilitation, Judge Sorokin has already dismissed such a claim. Docket No. 100.

In addition, Knox signed the confidentiality waivers[171] and therefore did receive

treatment throughout his confinement at MTC.  To the extent he argues that he received less than

optimal treatment because he felt constricted by the lack of confidentiality,[172] this simply does

not meet the "shock the conscience" test.   He has made no argument that he was harmed by the

level of treatment that he received.  Indeed, he has offered no medical opinions that the treatment

was sub-par in any respect.   In addition, Knox has failed to provide any evidence of any

individual acts or omissions by any of the individual defendants pertaining to the confidentiality

waivers themselves that affected his medical treatment.[173]  Rather, he argues, for example, that

Julius "admitted that FHS agreed to limit confidentiality protections because it was a condition

of the contract put out for bid by DOC."  Docket No. 137 at 14.  Without any further

explanation, this assertion forms no basis for liability against Julius.  For all these reasons, even

assuming that Knox has proved a serious medical need existed, no reasonable jury could

conclude that the individually named defendants were deliberately indifferent to Knox.

Accordingly, summary judgment should be granted with respect to Counts 5 and 6.

> ### 3.   Equal Protection Clause (Count 7)

Knox avers that his Equal Protection claim arises from having been treated differently

from other similarly situated disabled individuals.  Docket No. 134 at 13.[174]

---

[171] FHS SOMF ¶¶ 116-18, 120-21; Pl. Resp. ¶¶ 116-18, 120-21.

[172] FHS SOMF ¶ 113; Pl. Resp. ¶ 113.

[173] It is not apparent, and Knox does not allege, that any of the individual defendants signed the confidentiality waivers or discussed their content with him.  See Docket No. 120-2 at 2, 4, 6, 8. It appears that Defendant Julius signed several contact notes in a supervisory capacity.  See id. at 3, 9.  In any event, Knox has not argued that this conduct is a basis for Julius' liability.  Docket No. 137 at 12-13.

[174] The alleged unconstitutional conduct that underlies Knox's Equal Protection claim is his assignment to the second floor of the MTC.  Amended Compl. ¶¶ 125-30.  Knox already challenges this conduct under the ADA, Article 114 of the Massachusetts Constitution and the Rehabilitation Act.  Id. at ¶¶ 85-105.  Accordingly, Knox's Equal Protection claim may well be

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." Id. (citing Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-41 (1985)). "The disabled are not a suspect class for equal protection purposes." Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006) (citing Cleburne, 473 U.S. at 448-50). The Supreme Court has explained further that "[s]tates are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367-68 (2001). Accordingly, rational basis review is appropriate here and Knox must demonstrate that placement on the second floor lacked a rational relationship to a valid penologicial objective.

"In order to set out a plausible equal protection claim, the [plaintiff] must allege facts that he was treated differently from others similarly situated." See Callaghy v. Town of Aquinnah, 880 F. Supp. 2d 244, 252 (D. Mass. 2012) (citing Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008)). The test for whether a plaintiff has shown that shown that individuals are similarly situated is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Barrington Cove, Ltd., v. R.I.

---

precluded by the ADA's comprehensive remedial scheme. This Court, however, does not address this argument as it finds for the individual defendants on the merits.

Hous. & Mortg. Corp., 246 F.3d 1, 8 (1st Cir. 2001) (internal quotation marks and citations omitted).  "Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples must be compared to apples."  Id. (citation omitted).  Although the determination as to whether parties are similarly situated is a "fact-bound inquiry" this does not mean "that every case, regardless of the proof presented, is a jury case."  Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007).  A plaintiff must identify the similarly situated entities and circumstances to "a high degree."  Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 610 F.3d 8, 16 (1st Cir. 2010).

Knox must "first identify related specific instances where persons situated similarly in all relevant respects were treated differently, instances which have the capacity to demonstrate that [he was] singled . . . out for unlawful oppression."  Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (emphasis in original).  Knox "must show that the parties with whom [he sought] to be compared have engaged in the same activity vis-a-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile."  Cordi-Allen, 494 F.3d at 251.

Here, Knox's placement on the second floor was supported by the recommendation of his treatment providers.[175]  While Knox argues that his comprehensive evaluation should have been completed prior to such placement, he provides no evidence that the treatment recommendation at the time was erroneous or discriminatory.  In addition, there is no evidence of record pertaining to similarly situated individuals – namely wheelchair-bound inmates who required similar treatment to Knox, and how they were treated in terms of housing and therapy placement.

---

[175] FHS SOMF ¶ 61.

While there is passing reference to wheelchair-bound or otherwise mobility-limited inmates,[176] there is no evidence of their treatment needs.  Accordingly, no reasonable jury could conclude that Knox's placement on the second floor lacked any rational penological objective or that he was treated differently from similarly situated individuals.  For that reason, summary judgment should be granted to the individual Defendants with respect to Count 7.

### 4.   Procedural Due Process (Count 8)

Knox argues that he has a liberty and property interest in DOC granting his grievances with respect to placement on the second floor.  He further argues that he was owed "deliberate consideration", Amended Compl. ¶ 135, and the Defendants' "perfunctory denial" of his grievances regarding his placement violates the procedural due process clause.[177]  Docket No. 134 at 13.  This Court disagrees.

A procedural due process claim applies only where there is a deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972).  Specifically, under the Fourteenth Amendment, procedural due process requires that there be notice and opportunity for a hearing before a person is deprived by state action of a protected interest.  Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); Fuentes v. Shevin, 407 U.S. 67, 96-97 (1972).  Such interests are not created by the Constitution, but are defined by existing rules or understandings that stem from an independent source, such as state law.  Roth, 408 U.S. at 577.  To have a protected

---

[176] Knox Tr. 77:20-22, 78:8-16.  FHS SOMF ¶¶ 111, 127-28.

[177] At oral argument, Knox clarified that he is not pursuing any claims pursuant to Articles 1, 10 and 12 of the Massachusetts Constitution.  Accordingly, summary judgment should be granted to the Defendants on Count 9.

interest in a benefit, a person must have a legitimate claim of entitlement to it.  Id.  It is not

enough to have an abstract need or desire for it, or even a unilateral expectation of it.  Id.

"The failure to respond to a grievance to the satisfaction of the inmate does not, standing

alone, implicate a liberty interest."  Hicks v. Ryan, No. 13-10709-RGS, 2013 WL 1992679, at

*10 (D. Mass. May 9, 2013).  Consequently, courts have repeatedly denied Section 1983 claims

arising from the alleged failure to properly investigate prisoner grievances.  See Leavitt v. Allen,

No. 94-1641, 1995 WL 44530, at *2 (1st Cir. Feb. 3, 1995) (unpublished table decision); Hicks,

2013 WL 1992679, at *10; see also Stringer v. Bureau of Prisons, 145 Fed. Appx. 751, 753 (3d

Cir. 2005).  In addition, an inmate does not have a liberty interest in being housed or classified in

a particular facility.  Meachum, 427 U.S. at 225.  As prison inmates do not have a liberty interest

in where they are housed, transfers within the prison are well within the discretion of prison

officials and inmates are not constitutionally protected from such transfers.  See Olim v.

Wakinekona, 461 U.S. 238, 244-45 (1983).  There is also no liberty interest in a particular prison

program.  See Moore v. Weeden, No. 09-434 S, 2010 WL 737655, at * 4 (D.R.I. Mar. 1, 2010)

(participation in rehabilitative sex offender treatment does not implicate the Fourteenth

Amendment).

Knox does not have a constitutionally protected interest either in the way the grievance

procedure was handled or in his placement in a particular program or unit of his choice.  In

addition, even if he did have a protected interest, he has produced no evidence that the procedure

was faulty in any way.  Rather, he appears to disagree with the result.  Therefore, summary

judgment should be granted for the individual defendants for this reason on Count 8.[178]

---

[178] The DOC individual defendants, but not Julius, have raised the affirmative defense of
qualified immunity. Docket No. 123 at 16-17.  Because Knox has failed to establish a
constitutional violation on part of the DOC individual defendants, however, the Court does not

IV.     RECOMMENDATION

For the foregoing reasons, the Court recommends that the District Judge assigned to this case grant the Defendants' respective motions for summary judgment in their entirety and deny Knox's motion for partial summary judgment.

V.      REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).


                              /s/ Jennifer C. Boal
                              JENNIFER C. BOAL
                              United States Magistrate Judge

---

need to address their qualified immunity argument.  Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005) ("The failure of appellant's constitutional claims obviates our need to address the qualified immunity defense: we have found no constitutional violation.").